UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No. _CR 24-73WES_ |
| v. | Violations:<br>18 U.S.C. § 371 – Conspiracy to Commit Health Care Fraud |
| LUIS PINEDA | |

## INFORMATION

The United States Attorney charges that:

## Introduction

At all times relevant to this Information, unless herein stated:

1.      Defendant LUIS PINEDA ("PINEDA") was a resident of Rhode Island, and the owner and manager of Med-Y-Care, LLC and Pineda's Outdoor Living, LLC.

2.      Med-Y-Care was a Rhode Island corporation that was a nationwide supplier of durable medical equipment ("DME").   Med-Y-Care's principal place of business was 43 Railroad Street, Suite 120, Woonsocket, Rhode Island.

3.      Pineda's Outdoor Living was a Rhode Island corporation that was a construction company.   Pineda's Outdoor Living's principal place of business was 43 Railroad Street, Suites 115 and 7, Woonsocket, Rhode Island.

4.      PINEDA operated another business, RI Orthotics, LLC, that was a nationwide supplier of DME.   RI Orthotics was nominally controlled by PINEDA's

relative.   RI Orthotics' principal place of business was 43 Railroad Street, Suite 8, Woonsocket, Rhode Island.

## The Medicare Program

5.      The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received Medicare benefits were referred to as Medicare beneficiaries.

6.      Medicare was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

7.      Medicare was divided into four parts:   Medicare Parts A through D. Medicare Part B covered medically necessary physician office services and outpatient care, including DME, such as prosthetics, orthotics, continuous glucose monitors, ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces.

## Durable Medical Equipment

8.      DME companies, physicians, and other health care providers that rendered services to Medicare beneficiaries were referred to as Medicare "providers" ("Providers").   To participate in Medicare, Providers were required to submit an application.   As provided in the application, every Provider was required to meet certain standards to obtain and retain billing privileges to Medicare, such as, but not

2

limited to the following: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.   Providers were provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

9.     If Medicare approved the application, Medicare assigned the Provider a Medicare Provider Identification Number ("PIN" or "provider number").   Providers assigned a Medicare PIN to render services to beneficiaries could submit claims for reimbursement to Medicare that included the PIN assigned to that Provider.

10.     Medicare reimbursed DME companies for services and items rendered to beneficiaries.   To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

11.     A Medicare claim for DME was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment

provided to the beneficiary, the date the items or services were provided, the cost of the equipment, the name and identification number of the physician or other health care provider who ordered the items or services, and the name and identification number of the Provider who provided the items or services.   Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers.

12.    A claim for DME submitted to Medicare qualified for reimbursement only if it was medically reasonable and necessary for the treatment of the beneficiary's illness or injury, prescribed by a licensed physician, and accompanied by a completed prescription for braces and other Medicare-required documents (collectively, "doctors' orders.").   Medicare did not pay claims for services/supplies that were procured through kickbacks and bribes, or that were not medically necessary.   Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and program instructions, as well as federal criminal law.

### The Conspiracy

13.    From in or about April 2023, and continuing until in or about June 2024, in the District of Rhode Island and elsewhere, PINEDA did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States Attorney to:

　　　　　a.  defraud the United States out of money and property, and by impeding, impairing, obstructing, and defeating through deceit, craft, trickery, and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare; and

4

b. to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## Object of the Conspiracy

14. The object of the conspiracy was for PINEDA and his co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false claims to Medicare through Med-Y-Care and RI Orthotics; and (b) offering, paying, and causing the payment of kickbacks and bribes to foreign telemarketers and call centers in exchange for the referral of Medicare beneficiaries and doctors' orders for DME.

## Manner and Means of the Conspiracy

15. The manner and means by which PINEDA and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

a. It was part of the conspiracy that PINEDA controlled and operated Med-Y-Care and RI Orthotics.

b. It was further part of the conspiracy that PINEDA submitted and caused to be submitted false and fraudulent application documents and information to Medicare that concealed from Medicare PINEDA's interest in and control of RI Orthotics.

c. It was further part of the conspiracy that PINEDA paid illegal kickbacks and bribes to obtain access to Medicare beneficiaries' patient information from others, including foreign telemarketers and call

5

centers, who had contacted the beneficiaries in violation of Medicare rules and regulations, and induced the beneficiaries to accept DME braces regardless of medical necessity or valid doctors' orders.

d.  It was further part of the conspiracy that PINEDA obtained the Medicare beneficiaries' information to submit and cause to be submitted false and fraudulent claims to Medicare for DME that was medically unnecessary, unwanted, and not legitimately prescribed or ordered by doctors.   PINEDA submitted and caused to be submitted the false and fraudulent claims to Medicare through Med-Y-Care and RI Orthotics and their billing company.

e.  It was further part of the conspiracy that PINEDA and his co-conspirators concealed the scheme by creating false invoices that disguised the illegal pay-per-claim arrangement between PINEDA and his co-conspirators, including the foreign telemarketers.

f.  It was further part of the conspiracy that PINEDA created false invoices, and in an effort to conceal the distribution of health care fraud proceeds, he falsely labeled and caused to be labeled payments from RI Orthotics and Med-Y-Care to Pineda's Outdoor Living as "Consulting Fees" and "Loan Paid."

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the District of Rhode Island and elsewhere, at least one of the following overt acts, among others:

16.    On or about July 20, 2023, in connection with Med-Y-Care's Medicare application, PINEDA caused his employee and wife to falsely represent to a surveyor acting on behalf of CMS that PINEDA and his relatives did not own any other medical entities when in fact PINEDA controlled RI Orthotics, another DME business nominally owned by PINEDA's relative.

17.    On or about October 24, 2023, PINEDA submitted and caused to be submitted a false and fraudulent claim to Medicare in the amount of $1,399.16 in connection with the shipment of knee braces and lower extremity wraps sent to Medicare beneficiary, B.R., that B.R. did not need or want.

18.    On or about December 27, 2023, PINEDA created and caused to be created a false invoice in the amount of $70,000 to RI Orthotics for "Professional fees for advice on opening a business. . . ."

19.    On or about January 11, 2024, PINEDA wired and caused to be wired $45,920 to C.I., a telemarketing call center located in Kanpur, India.   The "Originator to Beneficiary Instruction" on the wire falsely listed "Customer Support POP Operating Expenses" when in fact the payment was for the generation of Medicare claims.

20.    On or about January 12, 2024, Med-Y-Care received a fraudulent invoice from a co-conspirator, a telemarketer located in Pakistan.   The invoice, which was paid by Med-Y-Care, concealed the pay-per-claim arrangement between the telemarketer and Med-Y-Care.

21.    On or about January 24, 2024, PINEDA's relative, who was nominally in control of RI Orthotics, wrote two checks to Pineda's Outdoor Living made payable in the amount of $10,000 each with fraudulent memo lines.   One memo line read, "Monthly Consulting Fees JAN2024," and the other read, "Consulting fees."

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

22.     The allegations in this Information are realleged here for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

23.     Upon conviction of one or more of the Federal health care offenses, as defined in 18 U.S.C. § 24(a), charged in Count One of this Information, defendant LUIS PINEDA shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that he obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of each such offense, including but not limited to the following specific property:

- $239,775. 65 in U.S. currency held in Bank of America, account ending in 5415

- $534,071.77 in U.S. currency held in Bank of America, account ending in 7063

- $14,568.32 in U.S. currency held in Bank of America, account ending in 8992

- $11,758.83 in U.S. currency held in Navigant Credit Union, account ending in 4075

- $19,096.21 in U.S. currency held in Citizens Bank, account ending in 6809

- $125,010.14 in U.S. currency held in Citizens Bank, account ending in 0020

- $30,109.62 in U.S. currency held in Citizens Bank, account ending in 0486

### Substitute Assets Provision

24.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third person;

8

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be subdivided without difficulty;

25.  It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18 United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

ZACHARY A. CUNHA
UNITED STATES ATTORNEY

_____
SANDRA R. HEBERT
Assistant U.S. Attorney

_____
G. MICHAEL SEAMAN
Assistant U.S. Attorney

_____                    08/23/2024
LEE H. VILKER                    Date: _____
Criminal Division Chief

9